UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MAUREEN L. BEAUVAIS, Plaintiff, | ) | |
| v. | ) | C.A. No. 04-403T |
| CITIZENS FINANCIAL GROUP, INC., AND LIBERTY LIFE ASSURANCE COMPANY OF BOSTON Defendants. | ) | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT LIBERTY LIFE ASSURANCE COMPANY OF BOSTON'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 12.1, Defendant Liberty Life Assurance Company of Boston ("Liberty Life" or "Defendant") submits this Statement of Undisputed Material Facts In Support of Its Motion for Summary Judgment. Defendant hereby states that the following undisputed material facts are taken from the pleadings of record, the Affidavit of Paula McGee, and the administrative record concerning Plaintiff Maureen Beauvais's claim for disability benefits.[1]

**The Short-Term Disability Plan**

1. At all times pertinent to her claims in this lawsuit, Plaintiff was employed by Citizens Financial Group, Inc. ("Citizens") as an Assistant Vice President, Loan Processing Manager at a Citizens branch located in Warwick, Rhode Island. (See AR. at 321, 331).

2. As part of her employment with Citizens, Citizens offered Plaintiff short-term disability benefits. Citizen's maintained a self-insured short-term disability plan (the "STD Plan"). (AR at 44, 69). Citizens and Liberty Life entered into a Group Disability Risk

[1] The complete administrative record and policies relating to Plaintiff's claim were produced to Plaintiff on January 26, 2005 and are attached to the Declaration of Paula McGee, submitted herewith. The documents contained in the administrative record are labeled "AR__."

Management Agreement (the "Agreement") by which Liberty Life provides claims management to Citizens on an administrative services basis only. (AR at 43, 69).

3. Part One ("General Provisions") of the Agreement states: "Final authority and responsibility for the [STD] Plan and its operation are vested in [Citizens], and Liberty is empowered to act on behalf of [Citizens] for the Plan only as expressly stated in this Agreement or as mutually agreed in writing by Liberty and [Citizens]." (AR at 44).

4. Part Three ("The Sponsor's Obligations") of the Agreement states: "[Citizens] will indemnify and hold harmless Liberty and its directors, officers and employees from any claims, lawsuits, settlements, judgments, costs, penalties and expenses, including but not limited to attorneys' fees resulting from or arising out of or in connection with any function of Liberty under this Agreement..." (AR at 45).

5. Annex A-1 of the Agreement provides that Citizens will pay the benefits provided by the Plan. (AR at 48, 69).

6. Section 2 of the STD Plan ("the STD Policy") ("Definitions") defines "Disability" or "Disabled" with respect to short-term disability coverage as meaning, "the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Job." (AR at 52).

7. Annex B of the Agreement ("Determination of Eligibility") states that, "the Sponsor will determine each claimant's eligibility for benefits under the Plan and notify Liberty of such eligibility when forwarding the claim to Liberty for review." (AR at 68).

8. Annex B of the Agreement ("Claims Review") provides that, "[Citizens] will establish a procedure for reviewing disputed claims and any requests from claimants for a review of rejected claims. Liberty will provide [Citizens] with advice on any such claims. [Citizens]

will make the determination as to the final disposition of any ERISA appeals on claims that were denied or terminated by Liberty." (AR at 69).

**The Long-Term Disability Plan and Policy**

9. As part of her employment with Citizens, Plaintiff was offered long term disability coverage under a group disability insurance plan ("the LTD Plan"). This plan is an ERISA welfare employee benefit plan. (Id.). Under the plan, Plaintiff was provided with disability benefits through a policy of insurance – policy no. GF3-810-254959-01 ("the LTD Policy"). (AR at 1). Liberty Life issued the Policy and is the insurer for long-term disability benefits under the Policy. (Id.).

10. The Policy provides, in relevant part, an elimination period for long-term disability coverage as follows:

> Elimination Period: 180 days
>
> "Elimination Period" means a period of consecutive days of Disability or Partial Disability for which no benefit is payable. The Elimination Period is shown in the Schedule of Benefits and begins on the first day of Disability.
>
> If the Covered Person returns to work for any 30 or fewer days during the Elimination Period and cannot continue, Liberty will count only those days the Covered Person is Disabled or Partially Disabled to satisfy the Elimination Period. (AR at 4, 8).

11. Section 7 ("General Provisions") of the Policy states: "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding." (AR at 37).

**The Initial Review Plaintiff's Claim for Short-Term Disability Benefits**

12. On or about February 14, 2003, Plaintiff applied for short-term disability benefits under the STD Policy. (See AR at 327).

13. Plaintiff's application for STD benefits was based on a thyroid surgery which was scheduled for February 24, 2003. Plaintiff planned to be out of work for approximately two weeks following the surgery. (Complaint, ¶¶ 5-6; AR at 329).

14. As part of its initial review of Plaintiff's claim, Liberty Life requested and received from Citizens a Physical Job Evaluation Form and job description of Plaintiff's job. According to this form, Plaintiff's job required that she "manage daily operations in new loan processing; communicate, verbally and written, with customers; develop procedures and work flow processes; and participate in department and division wide projects." (AR at 321.)

15. On March 7, 2003, Liberty Life requested office treatment notes from Dr. Razib Khaund, Plaintiff's Orthopedic Surgeon, from February 24, 2003 through the present and completion of a restrictions form. (AR at 318-319). On May 17, 2003, Dr. Khaund sent to Liberty Life the completed restrictions form and an office note dated March 5, 2003.

16. In his note of March 5, 2003, Dr. Khaund told Plaintiff that she should remain out of work for an additional three or four weeks of therapy and in order to rest her neck. Dr. Khaund states in this note that Plaintiff had had a fair amount of soreness in her neck and "[a]t this point she has been out of work for the last two weeks or so, and we are going to continue her in that regard until we can get some further improvement in terms of the overall neck discomfort itself." (AR at 315-16).

17. On March 7, 2003, Liberty Life also notified Plaintiff that it was seeking additional medical information from Dr. Khaund and asked her to forward medical information

from her attending physicians other than Dr. Khaund, and to contact Dr. Khaund to ensure that a response to Liberty Life's request was made promptly. (AR at 317).

18. On March 12, 2003, Dr. Khaund completed the restrictions form sent by Liberty Life. (AR at 314). In the restrictions form, Dr. Khaund indicated his diagnosis of Plaintiff's condition was cervical degenerative joint disease and cervical radiculitis. (AR at 314). He stated, "Pt is not at work – fully disabled. She is to avoid (sic) work, prolonged sitting and (sic) standing. Limited ROM with regard to the neck." (Id.). He noted that these restrictions were from March 5, 2003 through the next evaluation in four weeks. (Id.).

19. Plaintiff returned to work part-time (5 hours per day) at Citizens from April 7 through April 11, 2004. She contacted Liberty Life on April 11, 2004 stating that she was going back out of work, that her neck was swollen, and that she was in pain. (AR at 96-97).

20. On April 14, 2003, Liberty Life requested that Dr. Khaund provide medical information on why Plaintiff needed to remain out of work, including office treatment notes from April 4, 2003 through the present and completion of functional capabilities and restrictions forms. (AR at 311-12).

21. On April 14, 2003, Liberty Life notified Plaintiff that it was seeking additional medical information from Dr. Khaund and asked her to forward medical records from other attending physicians. (AR at 310).

22. On April 22, 2003, Dr. Khaund provided Liberty Life with a completed restrictions and functional capabilities form and his notes from Plaintiff's office visit on April 4, 2003. (AR at 305 – 309).

23. In his notes from Plaintiff's April 4, 2003 office visit, Dr. Khaund noted that Plaintiff was being treated for follow up of her cervical degenerative joint disease. He indicated

that Plaintiff had made some improvements in terms of her range of motion but that her discomfort remained at a constant level. (AR at 308). He indicated that Plaintiff would be returning to work at reduced hours for "two weeks" at four hours per day, and that he would increase her back to her regular time period as tolerated. (Id.).

24. In the restrictions form, which Dr. Khaund completed on April 18, 2003, he indicated that Plaintiff attempted to return to work with modified hours on April 7, 2003 and April 11, 2003 through May 2, 2003, but that she was unable to continue after a few days. (AR at 306). He also indicated that Plaintiff was to avoid computer work, prolonged sitting, and standing, and that she had limited range of motion of her neck. (Id.). In the functional capabilities form, which Dr. Khaund completed on April 18, 2003, Dr. Khaund noted that an MRI of Plaintiff's neck revealed degenerative changes. (AR at 307). The MRI appeared to have been taken in December 2002. (Id.). He then indicated that she was going to have a surgical consultation for a possible fusion.

25. On May 7, 2003, Liberty Life requested that Dr. Khaund provide additional medical information, including office treatment notes from May 2, 2003 through the present and completion of another restrictions form. (AR at 303-04).

26. On May 7, 2003, Liberty Life requested medical information from Mark Palumbo, M.D., a physician with whom Plaintiff also consulted regarding her cervical degenerative joint disease, including his office treatment notes from April 30, 2003 through the present and a completed restrictions form. (AR at 301-02). Dr. Palumbo did not provide Liberty Life any medical information. (See AR at 295).

27. On May 7, 2003, Liberty Life notified Plaintiff by letter that it was seeking additional medical information from Dr. Khaund and Dr. Palumbo and asked her to forward

medical records from other attending physicians. (AR at 297-98). Liberty Life also provided Citizens with an update at that time. (AR at 300).

28. Dr. Khaund provided Liberty Life a restrictions form that had been completed on May 12, 2003. (AR at 292). Dr. Khaund advised that Plaintiff's restrictions were unchanged from the restrictions form completed on April 18, 2003. (Id.). Dr. Khaund also provided Liberty Life his notes from Plaintiff's office visit on May 2, 2003. (AR at 293). In these notes, Dr. Khaund explained that Plaintiff had met with a surgeon who told her that surgery was the last option. Dr. Khaund recommended that Plaintiff stay out of work and noted that work exacerbated Plaintiff's pain. He stated, "[t]here is definitely a stress component with regard to her job exacerbating her neck discomfort as well as the overall physical demands of the job itself. I do feel that sitting for any prolonged period of time at a desk is detrimental for her." (Id.) Dr. Khaund indicated his skepticism that Plaintiff would be able to return to work because of her neck arthritis and stated that he asked Plaintiff to consider other options for her future and to consider the possibility of applying for disability. (Id.). He concluded that he had placed her out of work for six weeks, and planned on seeing her back at that point.

29. On June 17, 2003, Liberty Life requested that Dr. Khaund provide additional medical information, including office treatment notes from May 3, 2003 through the present, and completion of another restrictions form. (AR at 289-90). On June 17, 2003, Liberty Life also requested medical information from Stephen Mallozzi, M.D., Plaintiff's primary care physician and an internist, including office treatment notes from May 30, 2003 through the present and completion of an attending physician's statement and a functional mental status evaluation. (AR at 287-88). In addition, Liberty Life notified Plaintiff on June 17, 2003, that it was seeking additional medical information from Dr. Khaund and Dr. Mallozzi and asked her to forward

medical records from other attending physicians. (AR at 283-84). Liberty Life also provided Citizens with an update at that time.

30. On June 24, 2003, Dr. Khaund provided Liberty Life a completed restrictions form and notes from Plaintiff's office visit on June 11, 2003. (AR at 274-77). Dr. Khaund completed the restrictions form on June 18, 2003, indicating that Plaintiff needed to avoid computer work, prolonged sitting and standing, and that she had a limited range of motion of her neck, avoid excessive use of shoulders, avoid lifting of more than five pounds, and avoid above shoulder movements. He noted that he would re-assess her ability to return to work in mid-August. (AR at 275). In his notes from Plaintiff's June 11, 2003 office visit, Dr. Khaund stated that Plaintiff had mechanical back pain and that she had been seen for possible depression and vertigo. (AR at 276-77). He noted that Plaintiff had intermittent numbness in her upper extremities and had tried using a collar while working at her computer to see if she could return to work, but that wearing the collar was very uncomfortable. (Id.). He noted that "[o]n physical exam today, she's overall neurovascularly intact in terms of her bilateral upper extremities. Good range of motion of the shoulders with fairly good strength." He then recommended that she continue certain medications, remain out of work for eight weeks, and continue to do exercises at home. (Id.).

31. On or about June 27, 2003, Plaintiff elected buy-up coverage under the long-term disability policy, and her STD and LTD claims were reassigned to Jeffrey Jones, Senior Disability Case Manager. (AR at 278-80).

32. On July 9, 2003, a nurse at Liberty Life reviewed Plaintiff's claim file. (AR at 84). This nurse concluded that the records did not support a continuation of the restrictions/limitations. Specifically, she found that the treatment plan for Plaintiff had not

appreciably changed as of June 11, 2003 but that Plaintiff's symptoms had improved, which was evident from her reports of only intermittent symptoms. The nurse also suggested that Liberty Life obtain an orthopedic review for further clarification of Plaintiff's claim. (Id.).

33. On July 10, 2003, Liberty Life sent Plaintiff a letter informing her that it would be reviewing her claim for LTD benefits. (AR at 267-68). In that letter, Liberty Life noted that Plaintiff had been receiving STD benefits since February 24, 2003 and that the maximum period for such benefits was 180 days or until August 22, 2003. (Id.). Liberty Life explained that "[d]uring the remainder of this benefit period, [it would] be reviewing [Plaintiff's] claim for consideration under" the LTD policy. (Id.).

34. As part of its review of Plaintiff's claim, Liberty Life requested and received an occupational description of Plaintiff's job, which was a Department of Labor description, from Patricia Thal, a Vocational Case Manager, on July 11, 2003. This description indicated that physical requirements for Plaintiff's job were sedentary. (AR at 258-265).

35. As part of its review, Liberty Life also sent the claims file to Anthony Parisi, M.D., a physician specializing in orthopedics, for a consulting physician referral. (AR at 234). Liberty Life requested that Dr. Parisi review the file to determine if restrictions and limitations were supported beyond the June 11, 2003 office visit with Dr. Khaund, to determine whether Plaintiff's treatment plan was appropriate, and to determine Plaintiff's prognosis. (Id.).

36. In his July 15, 2003 report, Dr. Parisi noted that Plaintiff had a history of degenerative disease of the cervical spine and that this was exacerbated after her thyroid surgery (AR at 235). Dr. Parisi opined that Plaintiff did not appear to have true radiculopathy. (Id. at 234). Further, Dr. Parisi opined that the restrictions and limitations were *not* supported beyond the June 11, 2003 office visit, because Plaintiff appeared to be doing quite well during that office

visit with a negative neurological exam and a reasonable range of motion. (Id. at 234-35). He also stated that he did not believe that an additional eight weeks out of work was warranted because it would not significantly alter her condition and that treatment had been reasonably appropriate. (Id.). He noted that her neurological exam had been relatively benign. (Id.). Regarding Plaintiff's prognosis, Dr. Parisi stated that "this is a degenerative process and is likely to slowly deteriorate with time." (Id. at 235).

37. On or about July 21, 2003, Dr. Mallozzi provided notes from Plaintiff's May 30, 2003 office visit, in which he described treatment plans for Plaintiff's vertigo and her alleged depression, conditions from which she allegedly suffered but which were not identified by her as the basis of her claim for STD benefits. (AR at 231-32).

38. On or about July 15, 2003, Plaintiff completed a claimant information form, an activities questionnaire, a claimant supplementary statement, a family information questionnaire, consent for release of information, a social security/reimbursement agreement, and a training-education-experience form and provided her resume. (AR at 213-22).

39. On July 29, 2003, Liberty Life wrote Citizens that it had reviewed Plaintiff's claim for disability benefits and had determined that Plaintiff did not meet the definition of "disability" under the STD policy. (AR at 228). In the letter, Liberty Life also stated that it had closed Plaintiff's claim for benefits effective June 14, 2003. (Id.). By letters dated July 29, 2003, Liberty Life notified Plaintiff that she was no longer eligible for STD benefits and that she was not eligible for LTD benefits, because she had not satisfied her 180-day elimination period. (Id. at 223-27). Liberty Life explained that the reviewing physician concluded that restrictions and limitations were not supported beyond Plaintiff's June 11, 2003 visit with Dr. Khaund. (Id. at 223). Liberty Life also advised that benefits were paid through June 13, 2003 and then

explained to Plaintiff her appeal rights and that she should provide any information with her appeal that she feels supports her claim. (Id. at 224, 226-27).

**Plaintiff's Appeal of The Denial of The Continuation of STD Benefits**

40. On or about January 4, 2004, Plaintiff sent a letter to Liberty Life describing her medical condition and providing copies of certain medical records and a list of her medications. (AR at 199-212). In her letter, Plaintiff described her medical history since November, 2002, when she allegedly discovered swelling on her clavicle and was subsequently diagnosed with severe degenerative disc disease. (Id. at 199). She provided information about her thyroid surgery, which occurred on February 24, 2003; alleged issues with dizzy spells; the discovery of a cyst on her brain, and receiving shots of cortisone in her head; depression; a rotator cuff tear, for which she had surgery on November 7, 2003; and arthritis and bursitis in her right knee. (Id. at 199-201). Plaintiff indicated that she had visited doctors other than Drs. Khaund, Mallozzi, and Palumbo since November, 2002, including A. Gerson Greenburg, M.D., Norman Gordon, M.D., Jules M. Friedman, M.D., William Kryos, M.D., and Robert Shalvoy, M.D. (Id.). Plaintiff enclosed records from Dr. Friedman relating to her alleged vertigo and a November 18, 2003 office note from Dr. Khaund relating to her surgery for a torn rotator cuff tendon. The only condition that Plaintiff or her physicians had previously identified as the basis for her claim was her cervical degenerative joint disease. (Id. at 203-12, 306).

41. Liberty Life considered Plaintiff's letter as her appeal. As a result, a nurse in Liberty Life's Managed Disability Services department reviewed Plaintiff's claim file, including the new records submitted by Plaintiff, and ultimately concluded that the records did not support restrictions/limitations beyond June 13, 2003. The nurse noted that the documents submitted by

Plaintiff included contradictory information regarding Plaintiff's conditions. For instance, Dr. Friedman noted in his notes dated November 20, 2003, well after the denial of her STD benefits, that Plaintiff's neck had good range of motion and no cervical tenderness. He also noted that it was doubtful that her arachnoid cyst was responsible for her symptoms. The nurse also explained that no notes were provided relating to Plaintiff's alleged knee pain and that Plaintiff's rotator cuff injury did not occur until well after her claim for benefits was initially denied. (AR at 79-81).

42. Following this review, Liberty Life referred Plaintiff's file to John Holbrook, MA, MD, FACEP, an internist, for a further independent review of Plaintiff's claims, including a review of the documents submitted by Plaintiff on January 19, 2004. (AR at 198). In its request for review, Liberty Life asked Dr. Holbrook to determine whether restrictions and limitations beyond June 13, 2003 were supported by the appeal information provided by Plaintiff. (Id.).

43. In his review, dated January 22, 2004, Dr. Holbrook noted that Plaintiff's January 4, 2004 letter mentioned care and treatment by multiple physicians who were not previously identified by Plaintiff and whose records were not previously provided to Liberty Life for review. (See AR at 193, 197). Dr. Holbrook outlined Plaintiff's conditions, including depression, intermittent dizziness, thyroid metabolism, and arachnoid cyst, stating that it is unlikely that these conditions would cause any substantial limitation or impairment that would preclude Plaintiff from working. (Id. at 193-94). He noted that Plaintiff had rotator cuff surgery on November 7, 2003, and that a six-week course of therapy was prescribed. (Id. at 193). Dr. Holbrook also stated that an update of the orthopedic review by Dr. Parisi may be useful. (Id.). Dr. Holbrook pointed out that cervical degenerative joint disease and cervical radiculitis are

mentioned as the basis for impairment, not the other conditions identified in Plaintiff's January 4 letter. (Id.).

44. On February 12, 2004, Liberty Life referred Plaintiff's file to Dr. Parisi, requesting that Dr. Parisi review the information submitted on appeal and answer two questions: (1) "Could pain in neck have been shoulder injury radiating up?" and (2) "Are there meds that support R&Ls from closure date (6/03) thru office note from ortho on 11/18 supplied on appeal?" (AR at 187).

45. In his review, Dr. Parisi stated that there was no new significant data that would alter his position on Plaintiff's limitations and that his opinion regarding her cervical condition remained unchanged. (AR at 185). He noted that the operative report relating to Plaintiff's shoulder surgery had not been provided. (Id.). Regarding the shoulder surgery, Dr. Parisi opined that it would only support limitations and restrictions for a period of three to four months. (Id. at 186). Dr. Parisi also concluded that it would be unusual for a rotator cuff problem to cause pain radiating up to the cervical spine, but stated that he did not have any other history concerning Plaintiff's shoulder and could not comment in further detail. (Id. at 185-86).

46. On February 17, 2004, Liberty Life notified Plaintiff that the medical reviews by consulting physicians concluded that restrictions and limitations were not supported by the records beyond June 14, 2003. Liberty Life then explained that Plaintiff's claim was being referred to the Appeal Review Unit for further review. (AR at 183).

47. On February 17, 2004, Liberty Life referred Plaintiff's claim to the Appeal Review Unit for further review. (See AR at 178, 183). The Appeal Review Unit determined that even with the additional information provided by Plaintiff, the restrictions and limitations were not supported for the period June 14, 2003 through the date of surgery on her shoulder,

November 7, 2003. (Id. at 175-77, 181-82). Specifically, the Appeals Unit concluded that the records did not support any claim based on conditions relating to her neck, depression, vertigo, arachnoid cyst, or a claim for her rotator cuff injury. (Id.). With respect to the rotator cuff injury, the Appeals Unit concluded that Plaintiff was not in active employment at the time of her surgery for that injury, and no benefits were deemed payable relating to that procedure. (Id. at 177, 182). On February 25, 2004, Liberty Life informed Citizens that it had reviewed Plaintiff's claim for STD benefits and recommended that the denial of benefits beyond June 13, 2003 be upheld. (Id. at 180).[2]

**Plaintiff's Second Appeal of The Denial of The Continuation of STD Benefits**

48. On April 5, 2004, Plaintiff sent a letter to Citizens again appealing the denial of her STD benefits and outlining her medical issues. (AR at 156-74). Plaintiff also enclosed a list of medications, notes from Dr. Khaund, notes and test results from Jules Friedman, M.D., and the results of an MRI from Rhode Island Medical Imaging. (Id. at 160-74). Plaintiff wrote in her letter that she continues to have pain in her neck and difficulty turning her head or looking up and down. (Id. at 156). She also claimed that she had a shot of cortisone in her knee as a result of pain, but that she now has difficulty walking, standing, and rising from a seated position. (Id. at 158). Plaintiff advised that she an abscess in her neck, which she had discovered in February 2004 and had surgically removed on March 9, 2004. (Id.).

49. After receiving Plaintiff's second request for review of her claim for STD benefits, on May 3, 2004, Liberty Life referred her file for an external peer review with an occupational health physician. (AR at 150-51). Liberty Life requested that the reviewing physician review her entire file including the most recent records that Plaintiff had submitted,

[2] Liberty Life presumes that Citizens denied Plaintiff's appeal, but Liberty Life was not provided with a copy of this denial letter. (AR at 110).

and: (1) Provide a description of the claimant's impairments, if any, and outline how any impairment translates to restrictions and limitations on physical activities; and (2) Determine whether these restriction/limitations were present after June 13, 2003. (Id. at 151).

50. On May 4, 2004, Shlomo Mandel, M.D., a Back and Spine Specialist associated with MLS National Medical Evaluations, Inc., submitted his independent review of Plaintiff's file. (AR at 126-32). He described Plaintiff's impairments, stating that there was no indication of musculoskeletal impairment and opining that the nature of the changes in her cervical spine does not produce functional impairment. (Id. at 130-31). He further opined that there was no indication of significant restriction or limitation on Plaintiff's functional activity and that she could perform frequent sitting, standing and walking activities, and carrying and lifting activities up to 20 pounds on an occasional basis. (Id. at 131). Dr. Mandel also stated that there was no indication that the clinical findings within the medical records limit her functional capacity or her ability to perform work within the sedentary to light category of work on a full time basis. (Id.). Dr. Mandel concluded that there was no indication of significant restriction or limitation present after June 13, 2003. (Id. at 131-32).

51. On May 5, 2004, Liberty Life wrote to Citizens, stating that it had completed its review of Plaintiff's second request for reconsideration of her STD benefits claim and that it was recommending upholding the denial of benefits beyond June 13, 2003. In that letter, Liberty Life noted that Citizens is responsible under the STD plan to make final claim determination and to communicate this determination to Plaintiff.[3] (Id. at 133, 141-42).

52. On June 16, 2004, Liberty Life provided Citizens with a copy of Plaintiff's claims file. (AR at 123).

---

[3] Liberty Life presumes that Citizens denied Plaintiff's second appeal and informed her of this denial. (AR at 110).

53. On June 22, 2004, Attorney Michael Horan wrote to Liberty Life requesting information about the status of Plaintiff's appeal, stating that Plaintiff had not heard anything about her appeal since February 2004. (AR at 116, 119, 122). Attorney Horan wrote again to Liberty Life on August 5, 2004, requesting a response to his previous letter and stating that Plaintiff would commence a court action against Liberty Life and Citizens if he did not receive a response within 10 days. (Id. at 113, 115). Liberty Life responded to Attorney Horan on August 12, 2004, explaining that Liberty Life provided claims management to Citizens on an administrative basis only and stated that it understood Plaintiff received notifications from Citizens regarding her first and second appeal. (Id. at 109).

Respectfully submitted,

LIBERTY LIFE ASSURANCE COMPANY OF BOSTON
By its attorneys,

Anthony J. DiOrio (RWP)

Anthony J. DiOrio, R.I. Bar No. 3419
JACKSON LEWIS LLP
127 Dorrance Street
Providence, RI 02903
(401) 454-7700 telephone
(401) 454-8855 fax

Andrew C. Pickett
(Admitted *Pro Hac Vice*)
Richard W. Paterniti
(Admitted *Pro Hac Vice*)
JACKSON LEWIS LLP
75 Park Plaza
Boston, Massachusetts 02116
(617) 367-0025

DATED: June 22, 2005

**CERTIFICATE OF SERVICE**

This hereby certifies that on this 22nd day of June, 2005, a copy of the foregoing document was served upon Plaintiff's attorney, Monica Horan, Esq., 393 Armistice Boulevard, P.O. Box A, Pawtucket, RI 02861, and upon counsel for Citizens Financial Group, Inc., Joseph D. Whelan, Esq., Hinckley, Allen & Snyder, LLP, 1500 Fleet Center, Providence, RI 02903, via overnight mail.

Anthony J. DiOrio (RWP)
Jackson Lewis LLP