UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

MAUREEN L. BEAUVAIS
Plaintiff,

v. C.A. No. 04-403T

CITIZENS FINANCIAL GROUP, INC.
AND LIBERTY LIFE ASSURANCE COMPANY OF BOSTON
Defendants.

MEMORANDUM AND ORDER

ERNEST C. TORRES, Chief Judge.

Maureen L. Beauvais ("Beauvais") brought this action pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against Citizens Financial Group, Inc. ("Citizens") and Liberty Life Assurance Company of Boston ("Liberty"). Beauvais seeks benefits under disability plans adopted by Citizens and administered by Liberty.

The case is, now, before the Court for consideration of the parties' cross motions for summary judgment; Beauvais's request for attorney's fees; and Liberty's motion to strike an affidavit filed by Beauvais in opposition to Liberty's motion for summary judgment.

For the reasons hereinafter stated, Beauvais's motion for summary judgment and her request for a determination that she is entitled to an award of attorney's fees are granted; the defendants' motions for summary judgment are denied; and Liberty's motion to strike is granted.

## Background Facts

### The Disability Plans

In 1987, Beauvais was hired by Citizens as a bank teller. By 2003, she had risen through the ranks to the position of Assistant Vice President in Citizens' loan processing department.

Citizens provides both short term and long term disability benefits to its employees. The short term benefits are provided pursuant to a Short Term Disability Plan ("ST-Plan") funded by Citizens and administered by Liberty.[1] Long term benefits are provided pursuant to a Long Term Disability Plan ("LT-Plan") also administered by Liberty but, under which, benefits are paid through insurance purchased by Citizens from Liberty. Both plans reserve to the Plan Administrator discretion to construe the terms of the plan and determine an employee's eligibility for benefits.

The ST-Plan defines "disability" as an employee's inability to perform the "material and substantial duties" of the job that the employee was performing at the time the disability began, (AR 52-53), and it provides benefits for a maximum of 180 consecutive days of disability. (AR 50). In order to receive any further benefits, the employee must look to the LT-Plan which provides for up to 24 months of benefits while the employee is unable to perform the

[1] Citizens is the Plan Administrator and Liberty is the Claims Administrator of the ST-Plan, in which capacity Liberty reviews and approves or denies claims. Final authority to accept Liberty's determination is vested in Citizens.

duties of her "own occupation" and, thereafter, while the employee is unable "to perform, with reasonable continuity, the material and substantial duties of any occupation." (AR 7). Eligibility for long term benefits is contingent on the employee, first, having qualified for and exhausted the maximum 180 days of benefits under the ST-Plan.

The Alleged Disability

In November 2002, Beauvais began experiencing discomfort and swelling in her neck and an MRI done on December 16, 2002, revealed a nodule on her thyroid. On February 24, 2003, Beauvais underwent thyroid surgery performed by Dr. Greenberg and, the next day, Beauvais began receiving disability benefits under the ST-Plan.

Following her surgery, Beauvais was under the care of Dr. Razib Khaund, another orthopedic surgeon. On March 5, 2003, Beauvais saw Dr. Khaund and his office notes state that, while Beauvais was recovering well from the surgery, she was suffering from overall neck discomfort. The notes state that Beauvais "has a fair amount of arthritic changes," and that she would be out of work pending re-evaluation in 3-4 weeks. Two days later, Liberty requested those notes and asked Dr. Khaund to complete a Restrictions Form. (AR 319).

On March 12, 2003, Dr. Khaund submitted the Restrictions Form which stated that Beauvais was suffering from "cervical

degenerative joint disease" and "cervical radiculitis."[2] (AR 314). The Restrictions Form referred to the December 16, 2002 MRI and to an X-ray of Beauvais's cervical spine taken in 2000. The Restrictions Form also stated that Beauvais was completely disabled, that she should avoid prolonged sitting or standing, and that she should remain out of work pending her next evaluation which was scheduled for four weeks later.

At Liberty's request, Citizens completed a Physical Job Evaluation Form describing, in general terms, the tasks performed by an assistant vice president/loan processing manager and estimating the time spent each day sitting, standing and walking. (AR 321).

On April 7, 2003, Beauvais returned to work part-time but, four days later, she informed Liberty that she could not continue because of pain and swelling in her neck. (AR 97).

That prompted Liberty to request Dr. Khaund's notes of an April 4, 2003 follow-up visit by Beauvais and to ask Dr. Khaund to complete a Functional Capacities Form and a Restrictions Form. Liberty did not request the cervical spine X-ray taken in 2000 or the December 2002 MRI referred to in Dr. Khaund's March 12, 2003 Restrictions Form. (AR 312).

On April 22, 2003, Dr. Khaund provided the requested

---

[2]Irritation or inflammation of the root of a spinal nerve. (UniCorMed Code Book).

information. His April 4, 2003 office notes describe Beauvais as suffering from "cervical DJD" (degenerative joint disease) and state that Beauvais's neck "discomfort remains at a constant level." (AR 308-309) They also state that an X-ray of Beauvais's collar bone did not show any significant abnormalities. The Restrictions Form submitted by Dr. Khaund contains a diagnosis of "cervical DJD" and "cervical radiculitis" and states that Beauvais was being referred to a spine surgeon to consider a possible fusion of her cervical vertebrae. (AR 306). The Functional Capacities Form expressed Dr. Khaund's opinion that Beauvais had only 1/3 normal capacity to perform a number of daily activities. (AR 307). Both the Restrictions Form and the Functional Capacities Form also refer to the December 2002 MRI which Dr. Khaund states revealed "degenerative changes."

On May 12, 2003, Dr. Khaund submitted another Restrictions Form to Liberty together with his office notes from a May 2, 2003 visit. Once again, he stated that Beauvais could not sit for any amount of time or return to work. In fact, Dr. Khaund expressed skepticism as to whether Beauvais ever would be able to return to work, given the severity of the arthritis in her neck. (AR 296). A few weeks later, Beauvais saw Dr. Mallozzi, her primary care physician, complaining of vertigo and depression. (AR 232).

On June 11, 2003, Dr. Khaund saw Beauvais again and recommended that she remain out of work for another eight weeks.

Accordingly, Beauvais asked Liberty to extend the short term disability benefits she had been receiving. Liberty responded by requesting Dr. Khaund's June 11, 2003 office notes, as well as another Restriction Form and it arranged for surveillance of Beauvais.[3]

The June 11, 2003 office notes provided by Dr. Khaund describe Beauvais's complaints of intermittent numbness or tingling in her upper extremities. They also state that Beauvais had tried but was unable to work on her computer while wearing a collar because the collar was uncomfortable and that she had been seen by a rheumatologist as well as Dr. Mallozzi. The notes further state that a physical examination of Beauvais showed her "overall neurovascular intact in terms of her bilateral upper extremities" and "[g]ood range of motion of the shoulders with fairly good strength." (AR 276). However, in the Restriction Form Dr. Khaund stated that Beauvais should avoid working at a computer, prolonged sitting or standing, excessive shoulder movement and lifting more than 5 pounds. (AR 275). He also recommended that Beauvais continue with pain medication and physical therapy and, as previously stated, that she remain out of work for another 8 weeks while continuing to see Dr. Mallozzi for treatment of vertigo. (AR 277).

---

[3] Beauvais's residence was surveilled on July 3, 4 and 7, 2003 but it appears that investigators never actually observed her. (AR 237 - 246)

The Claim File Reviews

On June 2, 2003, Nurse Christine Piechowiak conducted Liberty's first review of Beauvais claim file. (AR 94). Her assessment noted Dr. Khaund's diagnosis of degenerative disc disease based on the X-ray taken in 2000 and explains how the thyroid surgery may have aggravated Beauvais's symptoms. Piechowiak also pointed out that the December 2002 MRI was not in the file. More specifically, Piechowiak's assessment states:

> "Dr. Khaund indicated that previous c-spine xrays from year 2000 revealed severe DDD. MRI 12/16/02 (report not in file) outlined degenerative changes of c-spine w/mild stenosis c5-6 & severe neuroforaminal narrowing."
>
> - "In regards to Clmt's cervical DDD, although the MRI report itself is not in file, given Clmt's age, the findings as reported by Dr. Khaund would not be unusual. In someone w/severe DDD of the neck, and given a reported difficult intubation, this could have exacerbated her symptoms of neck pain, h/a muscle spasms. During intubation, the neck needs to be hyperextended and given that Clmt has difficulty w/this ordinarily, this could have exacerbated her neck symptoms. Clmt is noted to have severe neural foramina narrowing on MRI. The spine cord is surrounded by vertebrae; the foramina describes the hole that the spinal nerve roots go through as they exit the spinal cord. Arthritic changes encroach upon nerve root and make the passage smaller and can push on nerves. These changes are progressive and irreversible and can cause neck pain, limited ROM [range of motion], muscle spasms, radiating symptoms."

Nurse Piechowiak concluded that, based on the information contained in the file and Beauvais's failed attempt to return to work part time, the restrictions/limitations expressed by Dr. Khaund for the six week period following May 2, 2003, were reasonable.

On July 9, 2003, Nurse Piechowiak again reviewed the file, apparently after reading Dr. Khaund's June 11, 2003 office notes and Restrictions Form. This time, she stated that it was "not clear why ongoing R/L (restrictions/limitations) are indicated" in light of evidence that Beauvais had DJD (degenerative joint disease) since 2000 and, now, was reporting only intermittent symptoms. Accordingly, Nurse Piechowiak recommended orthopedic review for further clarification. (AR 84).

Liberty followed up by asking Dr. Anthony Parisi, an orthopedic specialist and one of Liberty's consulting physicians, to review the file. On July 15, 2003, Dr. Parisi submitted a report concluding that Beauvais suffered from a cervical strain that possibly resulted from being placed in an unusual position during her thyroid surgery and that the strain was superimposed on a preexisting degenerative joint disease of the cervical spine. (AR 234-35). However, because he found no indication that Beauvais complained of significant pain down her arms or of persistent numbness, Dr. Parisi did not believe that true radiculopathy was present. Dr. Parisi also stated that the degree of degenerative joint disease was "not clear," noting that the claim file did not include either an MRI or an X-ray report. In fact, Dr. Parisi's two-page report contains five separate references to the fact that no MRI or X-rays are in the file and it states that "[a]n MRI and plain x-rays would be of help in

determining the severity of her condition." (AR 235). Dr. Parisi expressed the opinion that the additional eight weeks out of work recommended by Dr. Khaund were not warranted but acknowledged that "this is a degenerative process and is likely to slowly deteriorate with time."

Liberty also requested that Patricia Thai, a vocational case manager, provide the Department of Labor's occupational description of a "Supervisor, Lending Activities." In providing that description for a supervisor of lending activities, Thai observed that it was a "basic description without input from a vocational professional" and suggested that a complete review of the file be conducted by a vocational case manager and that further investigation be considered. (AR 258).

On July 15, 2003, at Liberty's request, Beauvais signed an authorization enabling Liberty to obtain information about her from any health care provider and/or government agency. (AR 216). She also signed a Social Security Reimbursement Agreement permitting Liberty to offset any Social Security disability benefits for which Beauvais might be eligible against any disability benefits to which she was entitled under the ST-Plan and/or LT-Plan.[4] In addition, Beauvais signed a form authorizing Liberty to obtain information

[4] The Reimbursement Agreement provides for the offset not only of any Social Security disability benefits actually received by Beauvais but also any benefits for which she could have applied. (AR 220).

about her from medical providers, pharmacies, government agencies, credit reporting agencies, financial institutions, educational institutions and past employers. (AR 102). Finally, Beauvais completed a Claimant Information Form and Activities Questionnaire describing her job, daily routine at home and any conditions that prevented her from working. (AR 213-218).

On July 29, 2003, Liberty notified Beauvais that her short-term benefits were being terminated effective June 14, 2003 because she did not meet the definition of "disability" contained in the ST-Plan. The notification expressed Liberty's determination that the restrictions and limitations resulting from Beauvais's cervical strain superimposed on her degenerative joint disease did not prevent her from performing the duties of her "sedentary" job. The notification further stated that "X-ray or MRI reports were not present to support advanced degenerative disease." (AR 223)

A second letter from Liberty notified Beauvais that she, also, was ineligible for benefits under the LT-Plan because she had not qualified for and exhausted the maximum 180 days of benefits available under the ST-Plan. Both letters advised Beauvais that she could request a review of the denial by writing to Liberty within 180 days.

Following the denial of her claims, Beauvais continued to seek treatment for the degenerative disc disease and other ailments. Dr. Khaund's office notes from August 6, 2003 state that Beauvais

still complains of neck "discomfort and stiffness on a daily basis" and that she takes about five or six Vicodin per week. (AR 164). Dr. Khaund also reaffirmed his prior assessment that Beauvais was unable to "return to her job in any capacity" and he advised Beauvais to address her vertigo and a recently discovered brain cyst prior to considering surgery on her shoulder.

The Reviews and Appeals

On January 4, 2004, before the 180-day appeal period expired, Beauvais wrote to Liberty reciting the history of her neck problems, identifying the doctors who treated her and referring to the 2002 MRI that indicated degenerative disc disease. (AR 199-202). Beauvais's letter also referred to her problems with dizziness and vertigo; the discovery of a brain cyst that required cortisone shots and medication to drain fluids from her brain; surgery for a torn rotator cuff, and the development of bursitis in her knee. However, it appears that most of these problems arose after Beauvais's claim was denied, and they were not presented as a basis for her claim.

After receiving that letter, Liberty referred Beauvais's file to Nurse Debra Kaye for review. In her January 15, 2004 report, Nurse Kaye pointed to information in the file that seemed to contradict Dr. Khaund's assessment. In particular, Nurse Kaye referred to the November 20, 2003 finding by Dr. Friedman, a neurologist who was treating Beauvais for her dizzy spells, that

"clmnt's neck has good ROM & no tenderness." (AR 209). However, Nurse Kaye also stated, "It is again noted that diagnostic test results [C-Spine & MRI reports] have not been submitted to clarify the severity of cervical DDD."

On January 22, 2004, Beauvais's file also was reviewed by Dr. John Holbrook, an internist. (AR 188-192). Dr. Holbrook noted that many of the conditions referred to in Beauvais's letter were not the basis for her claim and, with respect to the cervical degenerative joint disease and cervical radiculitis, he recommended an updated review of the orthopedic records by Dr. Parisi.

Liberty followed Dr. Holbrook's recommendation and referred Beauvais's file back to Dr. Parisi for further review. Specifically, Liberty asked if any medical records supported Beauvais's claimed restrictions and limitations during the period between June 13, 2003 when her claim was closed and the November 18, 2003 visit to Dr. Khaund following Beauvais's rotator cuff surgery. Dr. Parisi's opinion regarding Beauvais's cervical condition remained unchanged because he found "no new medical information of significance," (AR 185), and "no medical documentation to support significant limitations and restrictions as far as her neck condition is concerned." (AR 186). However, he did acknowledge that the rotator cuff surgery on November 7, 2003 would have supported a finding of limitations and restrictions for approximately 3 - 4 months.

On February 17, 2004, Liberty informed Beauvais that it had concluded that her claimed "restrictions and limitations are not supported by the information on file" and it referred her claim to the Appeal Review Unit. (AR 183).

The Appeal Review Unit upheld the termination of Beauvais's short-term benefits "in the absence of medical evidence to support total disability beyond June 11, 2003" and stated that no benefits were payable for her rotator cuff surgery because Beauvais was not considered in active employment on that date. (AR 176-177). Consequently, Beauvais's appeal was denied.

On April 5, 2004, Beauvais wrote a letter to Citizens further questioning the denial of her short-term benefits. (AR 156-59). Her file, then, was referred to Dr. Shlomo Mandel, a back and spine specialist, for " external peer review." (AR 126-132). Dr. Mandel found no indication of muscoskeletal or functional impairment and stated that Beauvais should be able to stand, sit, walk and lift up to 20 pounds on a regular basis but he did not explain how he reached that conclusion. Dr. Mandel stated that "[t]here is no indication based upon the objective medical evidence provided that the clinical findings within the enclosed medical records limit her functional capacity or her ability to perform work within the sedentary to light category of work on a full-time basis." (AR 131).

On May 5, 2004, after receiving Dr. Mandel's report, Liberty

recommended that Citizens reaffirm the denial of Beauvais's claim for benefits after June 13, 2003, (AR 133), and it appears that on May 6, 2004, Citizens sent Beauvais a letter to that effect.

On June 9, 2004, Beauvais's application for Social Security disability benefits was approved and she began receiving these benefits retroactive to February 20, 2003.

## Standard of Review

In ERISA cases, where the Court simply reviews the administrative record, it appears that "no special inferences are drawn in favor of the plaintiff resisting summary judgment; on the contrary, the rationality standard tends to resolve doubts in favor of the administrator." Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 24 (1st Cir. 2003).

The denial of benefits under an ERISA plan is reviewed *de novo* unless the plan vests "authority to determine eligibility for benefits or to construe the terms of the plan" in the administrator or fiduciary. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 956-57, 103 L.Ed.2d 80, 95 (1989). In cases where discretionary authority is vested in the administrator or fiduciary, a more deferential "arbitrary and capricious" standard applies and the administrator's decision may be overturned only if it is "unreasonable in light of the information available to it." Pari-Fasano v. ITT Hartford Life and Accident Ins. Co., 230 F.3d 415, 419 (1st Cir. 2000); see, Greene v. Metropolitan Life Ins. Co.,

924 F. Supp. 351, 357 (D.R.I. 1996) (quoting Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 (3rd Cir. 1993))(reversal only if plan administrator's decision is "without reason, unsupported by substantial evidence or erroneous as a matter of law.")

In this case, it is clear that Liberty and Citizens had discretionary authority to determine whether Beauvais was entitled to disability benefits. However, since Liberty was responsible for paying long term benefits, and, since eligibility for long term benefits was contingent on exhaustion of the maximum short term benefits, Liberty's role in determining Beauvais's eligibility for both short term and long term benefits created a potential conflict of interest.

There has been some confusion regarding the effect of such a conflict in selecting the applicable standard of review. In Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181 (1st Cir. 1998), the First Circuit indicated that where discretionary authority was vested in a plan insurer that also administered the plan, the "arbitrary and capricious standard" should be applied unless the claimant showed that the denial of benefits "was improperly motivated." Id. at 184. Later, in Doe v. Travelers Ins. Co., 167 F.3d 53 (1st Cir. 1999), the Court described the test to be applied in such cases as one of "reasonableness." Id. at 57. In Pari-Fasano v. ITT Hartford Life and Accident Ins. Co., 230 F.3d 415 (1st Cir. 2000), the Court stated that the

determination made by an insurer/administrator having discretionary authority under a plan would be reviewed for "abuse of discretion," which the Court defined as a determination that was "unreasonable in light of the information available to it." Id. at 419. Most recently, the First Circuit has said that "the arbitrary and capricious standard is functionally equivalent to the abuse of discretion standard" and that this standard applied even if the administrator had to pay a plaintiff's claim from its own assets. Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan, 402 F.3d 67, 74 n.3 (1st Cir. 2005).

## Analysis

### I. Reasonableness of the Denial

The claim submitted by Beauvais contained a diagnosis of her condition, a description of how it restricted her ability to perform various tasks, and references to the diagnostic tests and surgical procedures she had undergone. It also contained the office notes of Dr. Khaund, her treating physician, as well as Dr. Khaund's opinion that she was disabled. Nevertheless, Liberty denied the claim for benefits after June 13, 2003 based on the absence of objective medical evidence to support Dr. Khaund's opinion that she was disabled.

Generally, the determination as to whether a denial of disability benefits constitutes an abuse of discretion is based on a review of the information contained in the claim file. Pari-

Fasano, 230 F.3d at 419. However, there may be cases where the administrator's failure to exert reasonable efforts in order to obtain information necessary for making a proper decision may amount to an abuse of discretion. Salley v. E.I. Dupont de Nemours & Co., 966 F.2d 1011, 1015 (5th Cir. 1992) (an administrator "can abuse his discretion if he fails to obtain the necessary information."). This is one of those cases.

In this case, Liberty was well aware that X-rays and an MRI had been taken and that they were important in properly evaluating Beauvais's claim. These tests were referred to numerous times in the reviews conducted by Nurse Piechowiak, Dr. Parisi, and Nurse Kaye. In fact, Dr. Parisi's report specifically stated that the X-ray and MRI would be helpful in determining the severity of Beauvais's condition.[5] Furthermore, the X-ray and MRI were readily available to Liberty. Beauvais was fully cooperative in providing any records that Liberty requested and she executed two forms authorizing Liberty to obtain virtually all of her medical records and other relevant information from any source. Under these circumstances, Liberty's failure to obtain the X-ray and MRI reports was unreasonable and an abuse of discretion.

Of course, this does not mean that a fiduciary or

---

[5] At oral argument, defendants' counsel argued that Dr. Parisi was not referring to the December 2002 MRI but rather to an MRI that should have been taken by Dr. Khaund in reaching his conclusions. However, Dr. Parisi's report states: "An MRI was apparently done but the report is not contained in the file." (AR 235) [emphasis added].

administrator has the burden of obtaining information necessary to support a disability claim. That burden clearly rests on the claimant. What it does mean is that it is an abuse of discretion for the administrator to deny an otherwise well documented claim for failure to provide additional information that the administrator never requested. While a claimant is obliged to provide information supporting her claim, the claimant cannot reasonably be expected to be a mind reader and to anticipate all additional information that the plan administrator may desire. If the plan administrator believes that the claim is deficient because relevant information is lacking, the administrator has an obligation to request the additional information before denying the claim on the ground that it has not been provided.

II. Remedy

A. Restoration of Benefits

When disability benefits have been denied unreasonably, a reviewing court has "considerable discretion" to fashion an appropriate remedy. Buffonge v. Prudential Ins. Co. of America, 426 F.3d 20, 31 (1st Cir. 2005) (quoting Cook v. Liberty Life Assurance Co., 320 F.3d 11, 24 (1st Cir. 2003)). Ordinarily, the court either will remand the case to the administrator for reevaluation or will make a retroactive award of benefits. 29 U.S.C. § 1132(a)(1)(B); Cook, 320 F.3d at 24. Generally, remand is appropriate where an award of retroactive benefits would result in an economic windfall to the claimant because it appears that the

claimant's disability ended at some time in the past. Id. (remand appropriate "if there were good reason to doubt that a reassessment would justify benefits for some or all of the past period."); Quinn v. Blue Cross & Blue Shield Ass'n, 161 F.3d 472, 478 (7th Cir. 1998)(award of retroactive benefits inappropriate where it might provide plaintiff "with an economic windfall should she be determined not disabled upon a proper reconsideration."). Conversely, where it appears likely that the claimant's disability continues, a retroactive award of benefits is appropriate. Cook, 320 F.3d at 24 (in the absence of evidence supporting a termination or where such termination was arbitrary and capricious, employee was entitled to retroactive reinstatement of benefits.) If the matter were simply remanded to the administrator for reconsideration, the further delay would unjustly penalize the claimant for the administrator's unreasonable denial of benefits and the administrator would have no incentive to refrain from unreasonably denying claims in the future.

This case calls for a retroactive award of benefits. As already stated, Beauvais's claim of disability due to degenerative disc problems and cervical radiculitis was supported by the findings and opinion of Dr. Khaund. Furthermore, Dr. Khaund's opinion finds some support in Nurse Piechowiak's explanation regarding how thyroid surgery could have aggravated Beauvais's degenerative disc disease and that the condition was likely to get progressively worse. While neither Liberty nor this Court is bound

to unquestioningly accept Dr. Khaund's opinion, that opinion cannot be rejected simply because it is not confirmed by objective test results that Liberty failed to request, particularly when Liberty's own medical reviewers indicated that the results would have been helpful in evaluating Beauvais's claim.

Nor does it appear that a retroactive award of benefits would result in an economic windfall to Beauvais because there are indications that her disability continues, to this day. As already noted, Nurse Piechowiak stated that changes in cervical degenerative disc disease are "progressive and irreversible." (AR 94). In addition, Dr. Parisi concluded that "[a]s far as prognosis is concerned, this is a degenerative process and is likely to slowly deteriorate with time." (AR 235). Finally, it appears that after Beauvais's short-term benefits were terminated, she developed other conditions contributing to her disability for which she was ineligible to receive benefits because she no longer was considered to be an active employee. For example, there are indications that Beauvais continued to suffer from dizzy spells and depression; an MRI revealed a cyst on her brain which was treated with shots of cortisone to her head and medication to drain fluid from her brain; she suffered a tear to her rotator cuff which required surgery; and she was diagnosed with arthritis and bursitis in both knees, making it difficult for her to walk, stand or rise from a seating position.

The continuing nature of Beauvais's disability seems to be

further confirmed by the fact that she is receiving Social Security disability benefits. While the test of eligibility for those benefits may be different from the test under Citizens' plans, Beauvais's receipt of those benefits certainly suggests that she suffers from significant physical limitations.

Any risk that a retroactive award of benefits might provide Beauvais with an economic windfall is further mitigated by the fact that, under the terms of the LT-Plan, Liberty is entitled to reevaluate her eligibility for continued benefits at any time. Thus, if Beauvais's disability ceases, her benefits may be terminated. In addition, Beauvais, now, is 62 years of age and, under the LT-Plan, her benefits cease when she reaches the age of 66.

B. Attorneys' fees

In ERISA cases, the court has discretion to award attorney's fees and prejudgment interest to a prevailing claimant. Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d 220 (1st Cir. 1996). See 29 U.S.C. § 1132(g)(1). Among the factors that a court may consider in deciding whether to award attorney's fees are: "(1) the degree of culpability or bad faith attributable to the losing party; (2) the depth of the losing party's pocket; (3) the extent (if at all) to which such an award would deter other persons acting under similar circumstances; (4) the benefit (if any) that the successful suit confers on plan participants or beneficiaries generally; and (5) the relative merit of the parties' positions."

Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d at 225.

Here, while the defendants may not have acted in bad faith, they are culpable for unreasonably having denied Beauvais's claim and they easily can afford to pay her the lost benefits. Furthermore, requiring them to pay those benefits will help to deter plan administrators, in the future, from denying benefits for failure to produce records that they never requested, a deterrent that will benefit all plan participants.

An award of attorney's fees also is necessary to make Beauvais whole. In order to pursue her appeal and obtain the benefits that she, wrongfully, was denied, it was necessary for Beauvais to retain counsel. It would be a pyrrhic victory, indeed, if Beauvais were awarded the benefits that were improperly denied but was required to pay, from the benefits, the attorney's fees incurred in pursuing the appeal.

For the same reasons, an award of prejudgment interest, also, is appropriate. During the pendency of her appeal, Beauvais has been deprived of the use of the disability income that she would have received and any money that she paid for medical treatment of the condition that was the subject of her claim. Thus, an award of prejudgment interest is necessary to restore her to the position she would have occupied if her claim had not been unreasonably denied.

III. The Motion to Strike

There is no need for protracted discussion with respect to

Liberty's motion to strike the affidavit filed by Beauvais in support of her reply to Liberty's objection to Beauvais's motion for summary judgment because the statements in the affidavit are irrelevant to Beauvais's appeal.

Essentially, the affidavit avers that in July 2003, Beauvais attempted to deliver the December 2002 MRI to Liberty but was not permitted to do so; that Liberty told her to apply for Social Security benefits; and that she believed that Liberty would use the authorizations that she provided to obtain any desired records that had not been provided by Beauvais.

As Liberty points out, none of these things are part of the administrative record and most occurred after her claim had been denied. Furthermore, why Beauvais applied for Social Security benefits and what she subjectively believed about Liberty's use of the medical authorizations have no bearing on the merits of her appeal. Finally, in addition to post dating the denial of her claim, her alleged attempt to deliver the MRI does nothing more than confirm her willingness to provide Liberty with whatever information it requested, which she previously demonstrated by complying with all of Liberty's requests and by executing the two authorizations.

## Conclusion

For all of the foregoing reasons, it is hereby ORDERED that:

1. Liberty's motion to strike Beauvais's affidavit is GRANTED.

2. The motion of Liberty and Citizens for summary judgment is DENIED.

3. Beauvais's motion for summary judgment is GRANTED and judgment may enter in favor of Beauvais as follows:

   a. Beauvais is awarded disability benefits under the ST-Plan for the period from June 14, 2003 to August 23, 2003, and disability benefits under the LT-Plan for the period commencing on August 24, 2003 and continuing until such time as it is determined that she is no longer eligible for such benefits.

   b. Beauvais is awarded any amounts that she has expended for medical treatment with respect to the cervical condition that was the subject of her claim and that would have been covered by the plans.

   c. Beauvais is awarded prejudgment interest on the aforesaid amounts.

4. Beauvais is entitled to attorney's fees and, in accordance with Fed. R. Civ. P. 54(d), Beauvais may file a properly documented motion for attorney's fees within fourteen days from the date of this order.

IT IS SO ORDERED,

Ernest C. Torres

Ernest C. Torres, Chief Judge
Date: March 8, 2006